UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-00041-004 (CJN) |
| v. : | |
| : | |
| TERRY BROWN, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Terry Brown to 45-days of home detention, a probationary term of three years, 60 hours of community service, and $500 in restitution.

**I.     Introduction**

Brown participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in over $1.4 million of property damage.

Brown pleaded guilty to one count of 40 U.S.C. § U.S.C. 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a limited restraint on his liberty is appropriate in this case because: (1) Brown admittedly saw protective barriers that had been knocked down as he approached the entrance; (2) he saw officers firing tear gas into the growing crowd; (3) he walked into the Capitol, in particular, the Capitol Visitors Center; (4) Brown failed to heed the audible law enforcement commands and was arrested on the scene; (5) and has failed to timely express remorse or regret for his actions.

The Court must also consider that Brown's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Brown's failure to comply with law enforcement instructions during a riot that actually succeeded in halting the Congressional certification merits a 45-day term of home detention and probation based on an assessment of the relevant sentencing factors.

## Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 94 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Brown's conduct and behavior on January 6.

### *Terry Brown's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Brown traveled to Washington, D.C., from his home in Pennsylvania to attend the "Stop the Steal" rally. After attending the rally that day, Brown made his way to the Capitol.

Around the time Brown entered the Capitol, U.S. Capitol Police ("USCP") officers had already been under attack by rioters outside the building and fell back to a makeshift recovery area they had established in the Capitol Crypt. Before long, rioters also breached that recovery area, and began throwing objects and unknown liquid substances at the officers. The officers retreated down a stairwell to the Capitol Visitor Center ("CVC"), which is also part of the Capitol. Some

rioters threw chairs at the officers. At approximately 2:30 p.m., surveillance video captured officers retreating down the stairwell as chairs tumbled behind them. The officers then drew back to the end of a corridor in the CVC that led to an atrium on the House of Representatives side of the building.

Shortly after 2:30 p.m., within one minute, 20 seconds of chairs plummeting down the stairwell and an escalator, video surveillance captured Brown walking down the stairwell to the CVC. A rioter clad in military fatigues, waving a baseball bat, was at the base of the stairwell, appearing to exhort others to come down the stairs, as depicted below (Brown circled in red, other rioter circled in yellow):



Brown and others then gathered in a corridor at the end of which USCP officers had formed a defensive line. The officers issued commands for the rioters to leave the building. When Brown didn't immediately do so, he was arrested.

On January 7, 2021, the *Lebanon Daily News* published an article detailing Brown's January 6, 2021 arrest. Brown gave an interview stating, "I don't regret doing what I did, because we got a message across and the world knows it."[1]

The FBI did not uncover any evidence that Brown engaged in violence against law enforcement or destructive conduct at the Capitol grounds or inside the building. He cooperated with law enforcement following his January 11, 2021 arrest on the complaint, including consenting to be interviewed by the FBI. The government is not aware of any posts by Brown on social media.

Brown knew at the time he entered he Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

When he was interviewed in October for his Presentence Report, Brown did state he regretted the decision to enter the Capitol Building and he was sorry for his bad judgment. PSR at ¶ 39.

*Terry Brown's Interview*

Brown voluntarily agreed to an interview with the FBI at the time of his arrest, on January 11, 2021, for the complaint that had been issued on January 7, 2021. During the interview, he related that he drove alone to Washington, D.C. to attend President Trump's rally. He knew about the rally from Facebook. Brown said during the rally he heard the President say to march to the Capitol as the legislators were in session and to show support.

When he got to the Capitol, he saw the protective barriers had already been knocked down and people were on top of the inauguration platform shouting for others to come up. Tear gas was being fired into the crowd as Brown made his way up to the platform. He reached the top of the

---

[1] https://www.ldnews.com/story/news/2021/01/07/lebanon-county-arrested-during-capitol-siege-has-no-regrets-trump-supporters-election-washington/6588911002/.

platform and could see numerous people already inside the building.  He entered and saw trash and water bottles strewn on the floor.  While Brown said he picked up some trash, undersigned counsel are unaware of evidence to support or contradict that statement.

He heard someone shouting from a lower level, "we need help down here." Brown then went to the lower level and saw a group of rioters attempting to infiltrate another section of the Capitol. Brown said he made his way to the front of this crowd and asked a police officer if he could talk to the crowd.  Again, undersigned counsel are unaware of evidence to support or contradict this fact.  He stated when he attempted to engage the officer, the officer grabbed his backpack, threw him to the ground and detained him.

Brown felt going into the Capitol was making a statement to get political leaders to listen to the participants. He stated he did not affiliate or align himself with any groups or ideologies aside from being a supporter of former President Trump.

*The Charges and Plea Agreement*

Brown was initially arrested at the Capitol on January 6, 2021 and issued a summons to return to D.C. Superior Court.  On January 7, 2021, Brown was charged by complaint with violating 18 U.S.C. §§ 1752(a) and 40 U.S.C. §§ 5104(e)(2). On January 11, 2021, he was rearrested on the federal charges at his residence in Pennsylvania. On January 15, 2021, he was charged by an initial Information with four misdemeanor counts.  On January 21, 2021, Brown was charged by an Amended Information with four counts, violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 10, 2021, he pleaded guilty to

Count Four of the Amended Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Brown agreed to pay $500 in restitution to the Department of the Treasury.[2]

## II.   Statutory Penalties

Brown now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its

---

[2] The actual payee of the restitution should be the Architect of the Capitol, as indicated in the PSR at ¶ 91.

6

very nature, the attack defies comparison to other events. So too does the conviction this defendant now faces. Picketing, demonstrating, or parading at and inside the Capitol as part of the riot on January 6 was not like picketing at the Capitol some other day, without other or with relatively few other rioters present.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and likely would have smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or

penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Brown observed the disarray and disorderly conduct of a riot inside the Capitol building. As he descended the steps to the CVC he was walking towards another rioter, dressed in military fatigues, wielding and waving a baseball bat, appearing to exhort other rioters to come down the stairwell. Further, within Brown's view were at least two chairs that had been thrown to the floor less than a minute and a half prior to his coming down. This was clearly not evidence of a routine Capitol tour. Yet, he did not turn back. Brown then set the chair immediately in front of him upright and proceeded to the end of the CVC corridor until he was ordered to leave and was ultimately arrested.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Brown does not have a prior criminal conviction. PSR at ¶ 43. He would have zero points if the Sentencing Guidelines did apply to his offense of conviction. USSG § 4A1.2(c)(2). Accordingly, he would be in a Criminal History Category I. USSG §§ 4A1.1, 5A. The government notes that shortly after it extended the plea offer to him, Mr. Brown expressed his wanting to plead guilty. The defendant should receive credit for that early acceptance of responsibility, which the government has considered in making its sentencing recommendation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

9

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of this Court at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although the government has no evidence that Brown participated in violent or destructive behavior, his presence at the Capitol—along with that of all the rioters—contributed to beleaguering officers and allowed the riot to become a prolonged attack. Brown's decision to enter the Capitol and stay inside, despite the sights he witnessed, is the antithesis of taking a peaceful tour.

Brown knew that his entry in the Capitol was unlawful and it was evident to him and anyone else at the Capitol that a frenzied mob had converged on the Capitol and a riot had broken

10

out. All of the indications were there for him, including seeing the strewn chairs and trash and a camouflaged-clad rioter wielding a baseball bat.

Further, the first time he expressed any remorse for his actions that day were to the probation officer when he was preparing the Presentence Investigation Report.

At the same time, Brown's actions at the Capitol were limited, and he gave a statement to law enforcement when he was rearrested in Pennsylvania. Although the need to deter what happened in general on January 6 favors incarceration, the facts of Brown's specific case favor a sentence of home detention.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] All offenders must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the government invites

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who unlawfully entered, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention. Brown's conduct merits a term of home detention.

Brown has pleaded guilty to Count Four of the Amended Information, charging him with parading, demonstrating, or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

As described above, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he or she remained inside, the nature of any statements he or she made (on social media or otherwise), whether he or she destroyed evidence of their participation in the breach, *etc.*—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines

do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

The most relevant comparison is to the other defendants in the CVC with whom Brown was charged. Michael Curzio's criminal history is clearly distinguishable from Brown's and was a major factor in in the imposition of his sentence. Bradley Rukstales, threw a chair in the direction of the officers that had retreated down the CVC corridor and was not compliant upon his arrest at the Capitol. Douglas Sweet gave an interview to a local news station in Virginia on January 7, 2021, in which he said he traveled to Washington, D.C. hoping to "talk to the Senate and the House and actually speak" and realized he might have to "pretty much force [his] way in." The reporter

asked him, "Do you understand you cannot voice your concerns by barging into the Capitol building?" Sweet responded, "Well…what other recourse do we have? They will not listen to us." When the reporter asked him if he had any regrets about breaching the Capitol, he did not appear to express any. His response was, "From our actions come reaction."[6] He expressed no remorse until he appeared for his sentencing hearing. Cindy Fitchett recorded a video of herself stating in a raised voice, "We are storming the Capitol. We have broken in. Patriots arise. Woo!" Fitchett gave an interview upon her arrest and acknowledged she "got caught up in the moment," and she "made the wrong decision, which led to a wrong…outcome….My actions were my own." Near the end of the interview, she said "nobody forced me" to enter the Capitol. In her Presentence Report, she took responsibility for her actions and participation and expressed regret for her actions. Thomas Gallagher walked down the same staircase as Brown and carried one of the chairs that had been blocking the stairwell and placed it on the floor in front of the stairs. He reached out to another rioter that had picked up a chair, in a manner consistent with admonishing that person to put it down. The other individual did so seconds later. As early as April 5, 2021, Gallagher expressed great remorse for his actions and the impact they had on law enforcement officials, and for contributing to the disruption, fear, and evacuation of the Senate, Congress members, and other politicians during the certification of the election. He also stated he regretted his lack of judgment beyond anything he has ever felt.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

---

[6] The news report, including excerpts from a video interview of Sweet, is available at
https://www.wtkr.com/news/mathews-co-man-arrested-during-capitol-riot-trump-asked-all-the-patriots-to-show-up-so-i-did.

15

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Brown knowingly went through barriers on the outside of the perimeter that had been knocked down. Tear gas had been deployed. Once he got inside, he saw trash, water, and chairs strewn about. He saw another rioter in military fatigues wielding a baseball bat. He set one chair upright, suggesting he knew it was not right in its current position. Despite all of that, he continued his parading into and around the Capitol. The government knows of no evidence he told other rioters to stop. He was knowingly and willfully where it was against the law for him to be. On January 7, he told a local newspaper, "I don't regret doing what I did." On January 11, he told the FBI he felt going into the Capitol was making a statement to get political leaders to listen to the participants.

### IV. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Brown to 45-days of home detention as part of a sentence of 36 months of probation, 60 hours of community

service, a $10 special assessment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  /s/ *Susan T. Lehr*
SUSAN T. LEHR
Assistant United States Attorney (Detailee)
United States Attorney's Office for the
 District of Columbia
Nebraska Bar No. 19248
402-661-3700
susan.lehr@usdoj.gov

/s/ *Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
United States Attorney's Office for the
 District of Columbia
D.C. Bar No. 976587
202-252-5847
Seth.Meinero@usdoj.gov